**Linda JACKSON, Plaintiff–Appellant,**

v.

**QUANEX CORPORATION, Defendant–Appellee.**

No. 98–1515.

United States Court of Appeals, Sixth Circuit.

Argued June 18, 1999

Decided Sept. 9, 1999

Ada R. Montgomery (argued and briefed), Oak Park, MI, for Plaintiff-Appellant.

Debra M. McCulloch (argued and briefed), Todd J. Shoudy (briefed), James F. Hermon (briefed), Dykema Gossett, Detroit Gossett, Detroit, MI, for Defendant-Appellee.

Before: JONES, COLE, and CLAY, Circuit Judges.

## AMENDED OPINION

CLAY, Circuit Judge.

Plaintiff Linda Jackson appeals from the district court's judgment granting Defendant Quantex Corporation judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure, in this case alleging racial harassment in violation of 42 U.S.C. § 1981 of the federal Civil Rights Act, as well as in violation of Michigan's Elliott–Larsen Civil Rights Act. For the reasons set forth below, we REVERSE the judgment of the district court.

### I.

### A.

At times relevant to the present case, Quanex operated a manufacturing plant in South Lyon, Michigan which manufactured seamless steel tubing. In 1987 and 1988, in accordance with an agreement it signed with the Equal Employment Opportunity Commission ("EEOC") to increase the percentage of its African–American employees, Quanex hired approximately fifteen African–American employees, bringing the racial composition of the plant to eighteen African–American employees of a total population of 349 employees. Quanex hired Jackson, who is African American, for work at its South Lyon facility on March 2, 1987. During her employment with Quanex, Jackson began as a laborer but subsequently worked as a saw operator, furnace operator, and tub cleaner. In this action, Jackson alleges that from her first day with Quanex to her last, she was victimized by a racially hostile work environment resulting from numerous racist incidents which Jackson witnessed, experienced, and learned about from the small group of African Americans with whom she worked.[1]

---

1. The following summary includes facts that are in dispute, and facts that Jackson proffered but did not present at trial. We assume these facts for the purposes of our analysis because when reviewing a dismissal pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, we must take the facts in the light most favorable to the nonmovant. *See Tuck v. HCA Health Servs. of Tenn.,* 7 F.3d 465, 469 (6th Cir.1993). Moreover, as we will later

## 1. Racist Slurs

On her first day of work at Quanex, Jackson overheard Dwight Miller and Jim Voltz, two supervisors, discussing their desire to fire minority employees and the idea of placing stars on their helmets for each minority fired. Jackson made no complaint to Quanex because she was a new hire and in a ninety-day probationary period. Darlene Solomon, another African American hired by Quanex in 1987, overheard supervisor Bob Beatty speaking in a derogatory manner about African–American people wearing bags on their heads, and frequently heard co-workers use racial slurs including the word "nigger" shortly after she began work at Quanex. Don McComb, also hired in 1987, heard Dwight Miller regularly refer to him and other African–American employees as "colored." (J.A. at 1090.) In 1988, Lloyd Clayton, another African–American, learned from a co-worker that someone had called him a "stupid damn nigger," and overheard Dwight Miller and Bob Beatty saying that a particular African–American employee was not "like the rest of them" because he would "do as he is told." (J.A. at 579, 756.) Clayton later learned that when he replaced someone for a tub cleaner position, Dwight Miller commented that "no nigger was going to bump a white woman." (J.A. at 533–34.) Although Clayton reported the incident to Larry Samms, a general foreman, and to the Civil Rights Committee, Quanex undertook no investigation or action.

In 1989, Thomas Miller, an African–American employee who had repeatedly received racially offensive notes in his first year of employment with Quanex in 1981 and who regularly heard the term "nigger rigging" used there, heard his supervisor Leroy Shoaff constantly refer to African–American male employees as "boys" and to Caucasian male employees as "men," and

endured numerous comments from Shoaff about how Shoaff "was breast-fed by a black woman" and "he had black in him."[2] (J.A. at 196, 197.) Although Miller told Shoaff he no longer wished to hear these comments, Shoaff continued to make them. And, although Miller reported Shoaff's conduct to Quanex's personnel department, Quanex took no action. In 1990, Bernard Crittenden, also African American, overheard racial jokes and heard co-worker Donnie Stone refer to another African–American employee as a "nigger." (J.A. at 402.) Crittenden was also told by a foreman, when he sought apprenticeship training as an electrician, that "they did not want blacks inside of the electric shop." (J.A. at 1828.) In 1991, co-worker Sue Knerr called Edward Copeland a "stupid street nigger." (J.A. at 625–26.) When Copeland complained to Shoaff, their supervisor, Shoaff asked Knerr to apologize but took no other action.

Jackson personally experienced racial slurs as well. In 1992, when Jackson was working as a tub cleaner, she had a Caucasian assistant named Pam Fouts for approximately three months. On August 12, 1992, Shoaff told Fouts, "you're working for a nigger now, boy did you get screwed." (J.A. at 2119.) Although Anita Wardlaw, a representative on the Civil Rights Committee, urged Fouts to file a complaint, Fouts resisted because "she was being called a lot of things she didn't like, such as she is a 'nigger lover' and 'you are stabbing us in the back,' things like that." (J.A. at 1311.) Ultimately, Wardlaw had Fouts sign a prepared statement describing the incident, and used the statement to file a written grievance with Quanex. When Quanex took Shoaff's statement, Shoaff admitted asking Fouts whether she was "working for a black girl." (J.A. at 1293.) On August 20, 1992, Quanex issued a statement to Shoaff and

---

explain, these are facts relevant to Jackson's claim that would have been admitted were it not for error on the part of the district court.

**2.** In his deposition, Shoaff admitted to using the term "nigger" in jokes that he told, but could not recall how frequently or whether he told such jokes at Quanex.

Fouts stating that it could not take action because there were no eyewitnesses to the incident, and reminding them that discriminatory conduct and bearing false witness against another employee violated company policy and rules. Wardlaw viewed this response as unsatisfactory, as it appeared Quanex "wanted to just brush it up under the table and just let it go." (J.A. at 1314–15.)

On January 22, 1993, Jackson attended a routine meeting with her supervisors in which Dwight Miller opened with, "we are up to our asses in nigger sludge" or a comment that sludge was "ass deep to a tall nigger." (J.A. at 1818, 1902, 1942.) When another employee objected, Dwight Miller retracted his statement and said instead, "up to our ass in Indian sludge." (J.A. at 1819.) Jackson reported this incident to Quanex management. In response, Quanex posted a memorandum of apology on a bulletin board in the plant, and gave Dwight Miller a reprimand, telling him that if he used similar slurs in the future, it would take disciplinary action against him immediately. Dennis Lasker, the plant manager, spoke with Dwight Miller and told him that Quanex would not tolerate his behavior "anymore." (J.A. at 671.) Jackson never received an apology from Dwight Miller.

## 2. Racist Graffiti

Jackson regularly saw graffiti in the women's rest room depicting a male and a female and accompanied by comments comparing the penis sizes of white and black males, and learned of graffiti in the men's rest room depicting lynchings accompanied by the phrase, "KKK is back." (J.A. at 158.) Although it bothered her, Jackson did not report the graffiti to management. For at least two years, Jackson, and several other African–American employees, also saw graffiti on a door at the west end of the plant that said, "Blacks out back." (J.A. at 489, 1972.) While Jackson did not work in the west end of the plant, she passed through the area regularly during the summertime so that she could eat her lunch on the benches located outside that area of the plant. Although the graffiti disturbed her, Jackson again did not complain to management because she felt it "was common practice to see things of this nature, or to have incidences occur that I felt were racist." (J.A. at 1974.)

While Jackson did not report to management the racial graffiti she witnessed, several other African–American employees at the plant did. Among them was Wardlaw, who wrote a memorandum to Quanex management informing them that degrading racial slurs and graffiti had been used directly and indirectly towards people of color and minorities in the plant. (J.A. at 1320.) In 1988, Thomas Miller witnessed graffiti in the seam grinding area that depicted the lynching of African–American men, and although he reported the matter to personnel, nothing was done about the incident. Bernard Crittenden witnessed graffiti in all of the men's bathrooms in the plant on twenty-five to thirty occasions, and observed that supervisory foreman regularly used the bathrooms and were aware of the graffiti. Although he reported the graffiti to management on two occasions, management, while promising to take care of the problem, did not do so immediately or did not do so at all. Crittenden also once found the locker of Thomas Miller defaced with racial graffiti. Frank Ferguson, who worked as a general foreman and superintendent of the hot mill and finish and packing divisions at Quanex from 1981 to 1991, and served as manager of Human Resources from 1991 and 1993, held responsibility for equal employment opportunity and affirmative action issues in the areas he supervised, and regularly saw racial graffiti in the plant. When Thomas Miller reported further racial graffiti, including the phrases "KKK is back" and "Tom Miller, Number One Nigger," Ferguson's response was "[y]ou know where we are and you know what's going on." (J.A. at 760–61.)

### 3. Conduct

Workers at Quanex frequently and freely engaged in offensive conduct that was directed at African–American employees. On December 8, 1987, a group of Caucasian workers confronted Foster Benson, an African American newly hired by Quanex in 1987, accusing him of stealing $30 from and of making sexual comments towards a Caucasian female employee, and called him a "nigger" and a "motherfucker." (J.A. at 1219–20.) Benson reported this threatening incident to several foremen and to Prescott Crisler, then director of personnel at Quanex. On December 15, 1987, as Benson was leaving around 12:30 a.m., a pickup truck blocked the road, and several cars pulled up. A Caucasian man unknown to Benson came over to his car and told him, "Nigger, we want you to quit your job and not go to Proud Lake [Benson's residence]." (J.A. at 755, 1241.)

Benson reported the matter to the police and to Crisler, who advised him not to tell anyone about it. Crisler told Benson that there were organized groups of dangerous "rednecks" in the plant who did not like African Americans. (J.A. at 1272.) Although Crisler promised to show Benson photographs of Quanex employees so that he could make identifications, neither Crisler nor any other member of the personnel department did so. Benson later learned from Crisler and a supervisor known to him as "Leroy" that a group of employees had threatened Benson in retaliation for the firing of a white employee that had resulted in part from the complaints of an African–American woman. Benson voluntarily left his employment at Quanex on February 16, 1988, telling Sandy Hickman, the new director of personnel, that he was leaving because he was not satisfied with Quanex's investigation into the threats he experienced.

On June 7, 1991, Thomas Miller arrived at work to find his work shirt hanging on the outside of his locker with the words "Nigger Sucker" written over his name. He complained to Ferguson, who took pictures of the shirt and reported the matter to the general manager and to the union president. Ferguson conducted some investigation but never determined who had defaced the shirt. Eventually, Quanex published a general memorandum throughout the building saying Quanex would not tolerate racial harassment. On October 19, 1994, when Edward Copeland arrived at work, he discovered a crushed salamander on his machine. He interpreted the salamander as a death threat, and reported it to management. In the week following this incident, Copeland found several graffiti drawings around his machine, including a caricature of an African–American man kissing a rump. During that week, employees hung a "Black O' Lantern" and a "Sambo" drawing of an African–American man near Copeland's machine. Jackson saw graffiti referring to the incident in the west end of the plant, including a picture of a dead salamander being hung, a profile of what, to some, appeared to be an African–American man kissing the salamander, and language referring to "lily ass kissing." Jackson and Thomas Miller painted over that graffiti. Afterwards, someone wrote a comment on the painted area to the effect of "look, they didn't finish it again or a job not finished again." (J.A. at 2253.) Upon learning of the salamander graffiti, Ferguson believed it was racially motivated. He learned that "[t]here was an artist in the west end. Everybody knows that person as an artist, and that's the person who was doing the graffiti." (J.A. at 2192.) Ferguson did not ask for the name of that employee, and made no effort to discover the identity of that employee.

African–American employees at Quanex also found that their supervisors and co-workers treated them differently from Caucasian employees when it came to enforcement of company rules. In 1988, a Caucasian employee would not train Lloyd Clayton properly for his job in the hot mill, resulting in his disqualification for that job. Clayton learned from another Cauca-

sian employee that the hot mill department did not want blacks, and that everyone there knew he would be disqualified even before he started the job. When Clayton worked in 1989 and 1990 as a tub cleaner, Dwight Miller "wrote him up" for leaving hoses unwrapped, although it was common practice to leave hoses unwrapped. Similarly, Don McComb found that Dwight Miller would ask only McComb why he was not wearing his hard hat, when several Caucasian employees would walk into work without their hard hats on, and noticed that Leroy Shoaff would order only McComb and none of the other employees to begin work. Shoaff and Dwight Miller also disciplined McComb for being out of his work area when he was in the bath house for fifteen minutes speaking to Quanex personnel about his uniform, although other Caucasian employees were in the bath house and out of their work areas at the time. The discipline was later withdrawn.

This difference in treatment extended to the on-the-job training and opportunities for advancement the African–American employees at Quanex received. While working in the electrical shop in 1990, Bernard Crittenden discovered that some Caucasian electricians would refuse to work with or train him, and that when supervisors had an issue to discuss with workers, they would address their comments only to the Caucasian workers by standing with their backs to the African–American employees. Although he complained to Mark Andrews, his supervisor, Andrews told him there was nothing he could do about it. Darlene Solomon told Jackson that she felt she was not getting as much work and thus as much money as her Caucasian counterparts, and that when she worked as a sweeper on the shop floor, employees would deliberately throw trash on the floor. Solomon also observed that Caucasian employees had refused to train or had improperly trained her on the crane and furnace jobs and on the marker machine. In 1994, when Solomon and Edward Copeland began work as crane oper-

ators in the west end of the plant, they discovered that they were the only operators who were not being loaded with stock. Despite complaints from Solomon and Copeland, the company took no action against the employees who had refused to load the machines of Solomon and Copeland.

After hearing rumors that Dwight Miller had said that "no nigger is going to bump a white woman" when he got a tub cleaner job, Clayton discovered that unknown persons were leaving the acid valves in his work area open, thereby creating a safety hazard. Although Clayton repeatedly reported the problem to management, the acid valves problem stopped only after he complained to union representatives. Clayton also frequently received notes from Caucasian tub cleaner Ellen Forsythe telling him to do her work. Clayton informed her he would not do her work and informed management of the notes she had left him. In response, Forsythe forged a note from Clayton to her calling her a "white bitch." Clayton showed the forgery to supervisor Larry Samms, who agreed that it was not in Clayton's handwriting, but took no action against Forsythe.

Jackson faced similar problems when she received the tub cleaner position in 1992 after bidding for the job against Donnie Stone, a Caucasian worker. After she had been on the job for one month, Jackson noticed that someone was tampering with the acid valves after she had opened them to desired flow levels. Jackson feared that if the valves were left open, they would release improper levels of acid and create a corresponding safety hazard, and she believed Quanex would then blame and disqualify her from the job. She reported the problem to her supervisor, Larry Ledbetter, who built a box around the valves, locked the box, kept a key and gave one key to Jackson. However, someone kept cutting the lock off and breaking into the box to tamper with the valves, and

ultimately, Ledbetter stopped repairing the box. As a result, as she cleaned tubs, Jackson had to continuously check the valves to be sure that they had not been reset. Although most tub cleaners had helpers, despite her complaints Jackson did not receive a helper for at least one year.

On November 5, 1994, Quanex assigned Jackson to work with Donnie Stone. During an argument, Stone called Jackson a "nigger bitch" and physically assaulted her. (J.A. at 1840.) Jackson reported the incident to Ledbetter and to Ferguson. Although management officials scheduled a meeting on the matter, they conferred beforehand and determined that regardless of fault, they would require Jackson and Stone to apologize or to accept suspension. At the meeting, Jackson and Stone were told either to apologize to one another or to take a three-day suspension. When Jackson refused to apologize and accepted a three-day suspension, Stone told her to "shut up." (J.A. at 1847.) Jackson ultimately grieved the incident through the process set forth in her collective bargaining agreement, and received reimbursement for the three days of lost pay. Stone also won a grievance and recovered his three days of lost pay through arbitration. On November 16, 1994, partly in response, Quanex again posted a general bulletin stating that the company prohibited racial and sexual harassment. Because Jackson feared Stone, Ledbetter assigned another tub cleaner to work in the area where Stone worked. After this incident, Quanex no longer permitted Jackson to work overtime hours, even though there was ample work to be done. Although Jackson complained to Ledbetter, he told her there was nothing he could do about it.

After Jackson returned from her three-day suspension, on December 2, 1994, Stone and Sue Knerr reported her to management for taking pictures in the plant in violation of a Quanex rule. Quanex management officials Frank Ferguson and Terry Youngerman, Manager of Human Resources, met with Jackson to inquire whether she had a camera and was taking pictures inside the plant. Jackson told them she did not have a camera and was not taking pictures. Although the officials told Jackson she would be under investigation, Quanex ultimately did not discipline Jackson. Jackson later learned that during the investigation Stone told management she had a black camera while Knerr told management she had a white camera, and that management had deemed their report less than credible because their descriptions of the camera were contradictory. Quanex did not discipline Stone or Knerr in connection with this incident.

On December 5, 1994, Jackson took a leave of absence from Quanex because she was suffering from insomnia and nightmares about Donnie Stone, and because she began thinking about hurting him. She sought treatment from Susan Feuer, a psychotherapist with the Department of Psychiatry at Henry Ford Hospital. Her own physician, Dr. Terrio, prescribed antidepressants to her. After she left Dr. Feuer's care, Jackson underwent psychological testing with Dr. Michael Abramsky. Dr. Abramsky certified that while Jackson could work, she could not return to work at Quanex. As word of Jackson's leave spread at Quanex, Donnie Stone arrived at work on December 8, 1994 wearing a hard hat with a swastika on it. Ferguson reported this to Lasker, who suggested that they get Denzil Hatton, the union president, and go to speak with Stone. Hatton spoke with Stone and asked him not to wear the swastika. Ferguson later told Youngerman that the company, rather than the union, should have acted in the matter, by going on record against swastikas in the plant. Although Ferguson expressed his "concern that we had incidents going on in the mill; the salamander, the graffiti. It seemed to me to be escalating. Like I say, the graffiti, I didn't think just doing a piece of paper or having a meeting with a select few was solving the problem.

We needed to somehow make a firm stand or something more positive," Youngerman had no response. (J.A. at 292–93.)

**B.**

On February 5, 1995, Jackson and Thomas Miller filed suit in the district court against Quanex, alleging violations of 42 U.S.C. § 1981 and the Elliott–Larsen Civil Rights Act, Mich. Comp. Laws Ann. § 37.2101 *et seq.* ("Elliott–Larsen Act"). On July 20, 1995, the district court, the Honorable Avern Cohn presiding, granted Plaintiffs' motion to amend the complaint to add Plaintiffs Lloyd Clayton, Edward Copeland, Bernard Crittenden, Don McComb and Darlene Solomon. After a period of discovery, Quanex filed a motion for summary judgment against all Plaintiffs on March 18, 1996. The district court denied the motion in part and granted it in part, dismissing three of the seven plaintiffs from the lawsuit with prejudice. After the district court's ruling on Quanex's motion for summary judgment, all Plaintiffs but Jackson resolved their cases against Quanex. On October 29, 1997, Quanex filed motions in limine to exclude evidence of, among other things, its 1983 conciliation with the EEOC, and events taking place at Quanex that were not directed at or witnessed by Jackson. Jackson filed her response on November 11, 1997. Although the district court "preliminarily" ruled that the conciliation agreement was not admissible, it did not rule on the remaining motions in limine.

Jackson went to trial on March 23, 1998. During trial, the district court sharply limited Jackson's efforts to introduce evidence of racial harassment suffered by other African–American workers at Quanex and the responses of management to those incidents. On March 26, 1998, after Jackson completed her testimony, Quanex moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. The district court permitted Jackson to present additional witnesses, but warned her that she had a weak case.

Upon hearing that Jackson intended to call other African–American employees at Quanex to the stand to testify as to the racially hostile work environment there, Judge Cohn stated:

> [A]s I understand what you are telling me, the testimony of Critton [sic], Macomb [sic], Copeland, Fouts, would be cumulative or along the same lines of the testimony of Darlene Solomon.... That is not setting the tone of the work environment. You can't strain [sic], in my view, a series of isolated incidences, discrete incidences and dots and build a case of hostile environment.... And the fact that there is a subjective feeling by any minority group in a plant, that is an unhappy place to work in and are mistreated, standing by itself is irrelevant to this.

(J.A. at 2102–03.) On March 31, 1998, after Jackson closed her case, Quanex renewed its motion for judgment as a matter of law. Jackson filed a response to Quanex's motion on April 1, 1998. On that day, the district court told Jackson that she could not call more African–American employees at Quanex to testify because their "testimony would be cumulative to testimony already offered." (J.A. at 2226.)

The district court heard argument on the matter the following day, and on April 8, 1998, entered judgment as a matter of law in favor of Quanex, finding that:

> there was no evidence offered that plaintiff was suffering any psychological impairment in the workplace, had complained to management over the conditions of her employment, was contemplating leaving, or that she found it difficult to perform her job duties. Indeed, there was no evidence that she had taken any sick leave for any reason, or, as I said, found it difficult to do her work assignments because of the work environment. Aside from several isolated incidents and discrete acts to which plaintiff was neither a witness nor a party, plaintiff's proofs describe only two incidents in which

she was a party and which had racial implications. (J.A. at 2263.) Quoting Quanex's brief, the district court also stated that incidents used to establish a hostile environment "must be within the limitations period" and "must be reported." (J.A. at 2265.) Furthermore, with respect to the two incidents the district court credited as viable evidence of racial harassment, the district court found that management dealt with them promptly and appropriately. Jackson filed a timely notice of appeal to this Court on April 29, 1998.

## II.

This Court reviews *de novo* a district court's decision to grant judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. *See Monday v. Oullette*, 118 F.3d 1099, 1101–02 (6th Cir.1997). In reviewing the decision, we must consider the evidence in the light most favorable to the nonmovant, giving that party the benefit of all reasonable inferences. *See Tuck v. HCA Health Servs. of Tenn.*, 7 F.3d 465, 469 (6th Cir. 1993). Accordingly, when faced with a Rule 50(a) motion, a district court may not weigh the evidence or make credibility determinations, as these are jury functions. *See Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990). A dismissal pursuant to Rule 50(a) is improper where the nonmovant presented sufficient evidence to raise a material issue of fact for the jury. *See Sawchik v. E.I. DuPont Denemours & Co.*, 783 F.2d 635, 636 (6th Cir.1986) (citing *O'Neill v. Kiledjian*, 511 F.2d 511, 513 (6th Cir.1975)). In other words, the decision to grant judgment as a matter of law or to take the case away from the jury is appropriate "whenever there is a complete absence of pleading or proof on an issue

material to the cause of action or when no disputed issues of fact exist such that reasonable minds would not differ." *Id.*

Judgment as a matter of law pursuant to Rule 50(a) is appropriate only where "a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." Fed.R.Civ.P. 50(a)(1). The Advisory Committee has explained the intent of Congress in requiring that a party be "fully heard" before the grant of a Rule 50(a) motion for a dismissal, noting that "[i]n no event, however, should the court enter judgment against a party who has not been apprised of the materiality of the dispositive fact and been afforded an opportunity to present any available evidence bearing on that fact." Fed.R.Civ.P. 50(a)(1) advisory committee's note. In giving a "sensible reading" to the "fully heard" requirement of Rule 50(a), we have concluded that "it is impossible for this court to review whether, when all reasonable inferences from the evidence are construed in favor of the nonmoving party, a reasonable juror could find in favor of the nonmoving party if he is precluded from presenting the evidence he considers relevant." *Francis v. Clark Equip. Co.*, 993 F.2d 545, 555 (6th Cir.1993).

## III.

Jackson alleged that she suffered a racially hostile work environment while employed at Quantex in violation of 42 U.S.C. § 1981 of the federal Civil Rights Act, as well as in violation of Michigan's Elliott–Larsen Civil Rights Act, Mich. Comp. Laws Ann. § 37.2101 *et seq.* Both the federal and state civil rights provisions provide a cause of action for racial harassment in the work place.[3] *See Holt v.*

---

**3.** Section 1981 provides in pertinent part that all persons shall have the same right "to make and enforce contracts," which thereby "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms,

and conditions of the contractual relationship." 42 U.S.C.A. § 1981 (West 1994).

Michigan's Elliott–Larsen Act provides in pertinent part that it shall be unlawful for an employer to discriminate against an employee "because of religion, race, color, national ori-

*Michigan Dep't of Corrections,* 974 F.2d 771, 772 (6th Cir.1992) (noting that the Civil Rights Act of 1991 overruled *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) which held that a claim of racial harassment was not actionable under § 1981); *Witt v. Roadway Express,* 136 F.3d 1424, 1432 (10th Cir.1998) (noting that "[t]he Civil Rights Act of 1991, Pub.L. No. 102–166 § 2, amended 42 U.S.C. § 1981 to provide a cause of action for racial harassment"); *Malan v. General Dynamics Land Sys., Inc.,* 212 Mich.App. 585, 538 N.W.2d 76, 77 (1995) (recognizing that a cause of action for racial harassment is viable under the Elliott–Larsen Civil Rights Act) (citing *Sumner v. Goodyear Tire & Rubber Co.,* 427 Mich. 505, 398 N.W.2d 368 (1986)).

■ We review claims of alleged race discrimination brought under § 1981 and the Elliott–Larsen Act under the same standards as claims of race discrimination brought under Title VII of the Civil Rights Act of 1964 ("Title VII"). *See Alexander v. Local 496, Laborers' Int'l Union of N. Am.,* 177 F.3d 394, 418 (6th Cir.1999); *Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1311 (6th Cir. 1989). A plaintiff may advance a claim of discrimination by way of a racially hostile work environment under Title VII. *See Risinger v. Ohio Bureau of Workers' Compensation,* 883 F.2d 475, 479 (6th Cir. 1989).

Title VII deems unlawful an employer's decision "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C.A. § 2000e–2(a)(1) (West 1994). The Supreme Court first recognized a cause of action for a discriminatory work environment under Title VII when ad-

dressing a case of sexual harassment, noting that for such behavior "to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of (the victim's) employment and create an abusive working environment.'" *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)).

■ Because the same principles that govern sexual harassment also govern claims of racial harassment, *see Risinger,* 883 F.2d at 479, the United States Supreme Court's decision in *Harris v. Forklift Sys.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Michigan Supreme Court's decision in *Radtke v. Everett,* 442 Mich. 368, 501 N.W.2d 155 (1993), and our recent decision in *Williams v. General Motors Corp.,* 187 F.3d 553 (6th Cir.1999), govern here. In *Radtke,* the Michigan Supreme Court held that courts must evaluate the "totality of the circumstances" to determine whether unwelcome conduct created a hostile work environment actionable under the Elliott–Larsen Act. 501 N.W.2d at 167. In *Harris,* the United States Supreme Court asked lower courts faced with harassment claims to consider "all of the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." 510 U.S. at 23, 114 S.Ct. 367. The Court also "explained that the conduct in question must be judged by both an objective and a subjective standard: [t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 826 (6th Cir.1997) (citing *Harris,* 510 U.S.

gin, age, sex, height, weight, familial status, or marital status...." Mich. Comp. Laws

Ann. § 37.2102(1) (West Supp.1999).

at 21–22, 114 S.Ct. 367). In *Williams,* we affirmed these principles and the "totality of the circumstances" approach, stating that "the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." 187 F.3d at 562.

If the plaintiff can show that a hostile work environment existed, she must then prove that her employer "tolerated or condoned the situation" or "that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action." *Davis v. Monsanto Chem. Co.,* 858 F.2d 345, 349 (6th Cir.1988). As the Supreme Court recently announced:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). Courts may hold an employer directly, not derivatively, liable for co-worker harassment if "its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *See Blankenship v. Parke Care Ctrs.,* 123 F.3d 868, 873 (6th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998) (noting that the "act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment").

In the present case, the district court failed to rule on a pretrial motion to exclude evidence of racial harassment not directed at or witnessed by Jackson. Instead, the district court apparently withheld its ruling until as late as trial and its Rule 50(a) ruling, at which time it acted to exclude evidence of harassment not directed at or witnessed by Jackson by restricting her ability to admit testimony on such matters, and by ignoring such evidence in its judgment dismissing the case. In doing so, the district court essentially concluded that Jackson had failed to establish that she was subject to a racially hostile work environment without allowing Jackson to present evidence of events at Quanex giving rise to the hostile environment there. By failing to credit evidence of a pattern of racially offensive conduct at Quanex while crediting the few remedial actions Quanex took, and by placing undue emphasis on a perceived lack of a negative effect on Jackson's ability to do her job, the district court abandoned its responsibility to consider all of the circumstances, facts which in this case could have led reasonable jurors to conclude that Jackson was the victim of a racially hostile work environment. We therefore believe the district court erred in granting judgment as a matter of law to Quanex.

### A.

Regrettably, in disposing of this case, the district court excluded from its consideration evidence of virtually all of the incidents of racial harassment established by Jackson, on the grounds that they (1) were not directed at Jackson or did not occur in Jackson's presence, (2) did not involve overt racial overtones, or (3) were so commonplace at Quanex that they became, to the district court, "conventional conditions on the factory floor." The district court thereby adopted the extremely narrow view of workplace harassment that Quanex

has advocated both below and before this Court, one in which every single member of a protected class would have to suffer a series of affronts both explicitly racial and personal in nature before she could claim the existence of a racially hostile work environment. In essence, under this view, each minority employee would have to show that the employer had an intent specifically to harass her, and could not proceed on a theory that the employer had a general intent to harass all employees of the minority group. Put another way, this definition of workplace harassment holds the fact that an employer discriminates against other members of the same minority group irrelevant to the question of whether a particular member of the minority group suffered racial harassment. Moreover, Judge Cohn's position, which renders less actionable racial incidents in the workplace so common as to constitute, in his mind, "conventional conditions on the factory floor," seems inclined, incredibly, to condone racially harassing conduct the more prevalent that conduct becomes.

We find such a myopic view of harassment unacceptable, particularly in light of the directive in *Harris* that courts are to consider "all of the circumstances" in determining whether a hostile work environment exists. Under the "totality of the circumstances" approach, a "district court should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode." *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir.1992), *abrogated on other grounds by Miller v. Woodharbor Molding & Millworks, Inc.*, 174 F.3d 948, 949 (8th Cir.1999). In rejecting the narrow approach adopted by the district court in this case, we recently observed that when a lower court disaggregates the claims of a plaintiff alleging a hostile work environment, contrary to the "totality of circumstances" approach, it robs the incidents of their cumulative effect, and "[o]f course, when the complaints are broken into their theoretical component parts, each claim is more easily dismissed." *Williams*, 187 F.3d at 562. As the Third Circuit has put it, "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir.1990). To consider each offensive event in isolation would defeat the entire purpose of allowing claims based upon a "hostile work environment" theory, as the very meaning of "environment" is "[t]he surrounding conditions, influences or forces which influence or modify." Black's Law Dictionary 534 (6th ed.1990). In implicit accordance with these principles, we have emphasized that offensive comments need not be directed at a plaintiff in order to constitute conduct violating Title VII. *See Black*, 104 F.3d at 826.

■ Given that analysis of this claim required a consideration of all of the circumstances, the district court committed error when it deemed irrelevant the overwhelming evidence Jackson proffered documenting discriminatory conduct towards other African–American employees at Quanex. The notion that courts should deem probative the conduct of an employer towards an entire minority group—even when an individual, and not a group, brings the complaint—is not new to this realm. In *Meritor*, the landmark case establishing a cause of action under Title VII for workplace harassment, the Court observed that employees are entitled to protection in "working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." 477 U.S. at 66, 106 S.Ct. 2399 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971)). There, the Court approved of a Title VII harassment claim brought by a Hispanic plaintiff who alleged that her employer created a hostile work environment for employees by discriminating against Hispanic clientele.

*See id.* at 65–66, 106 S.Ct. 2399. As *Meritor* demonstrates, an employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself.

Comments that single out members of a protected class are relevant not only as to whether a particular work environment was objectively hostile to members of the protected class, but also as to whether an employee belonging to the protected class subjectively felt harassed.[4] Consequently, in the sexual harassment context, this Court has deemed probative remarks that demeaned women generally while not demeaning any one woman in particular. *See Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 251–52 (6th Cir.1998) (considering evidence that employees commented that land adjacent to a Hooters restaurant should be called "Hootersville," "Titsville," or "Twin Peaks," and used the term "broad" to refer to a female). We have also credited evidence of racial harassment directed at someone other than the plaintiff when the plaintiff knew a derogatory term had been used. *See Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1079 (6th Cir.1999). Indeed, "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work environment." *See Schwapp v. Town of Avon*, 118 F.3d 106, 111–12 (2d Cir.1997) (citing *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 151 (2d Cir.1997)). Accordingly, racial epithets need not be hurled at the plaintiff in order to contribute to a work environment that was hostile to her. *See Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 673–75 (7th Cir.1993). Evidence of racist conduct affecting African–American employees certainly mattered as to whether the work environment at Quanex was objectively hostile to African Americans, and evidence

that Jackson learned of these incidents clearly demonstrated that, as an African American, she subjectively perceived that her work environment was one hostile to her.

The district court again eschewed the "totality of the circumstances" approach when it discounted evidence of harassment, such as the false accusation that Jackson took photographs in the plant or the acid valves incidents, that had "no racial components in the description." Title VII has long afforded employees the right to work in an environment free from "discriminatory intimidation, ridicule and insult," *Meritor*, 477 U.S. at 65, 106 S.Ct. 2399, without limiting this concept to intimidation or ridicule explicitly racial in nature. *See Andrews*, 895 F.2d at 1485. As the Court recently stated:

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing ..., and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale v. Sundowner Offshore Servs., Inc.*, — U.S. —, 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998).

Thus, a court should not examine each alleged incident of harassment in a vacuum, as "[w]hat may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents." *Vance v. Southern Bell Tel. & Telegraph Co.*, 863 F.2d 1503, 1510 (11th Cir.1989), *abrogated on other grounds by Harris*, 510 U.S. at 20–22, 114

---

**4.** This is so even if harassment others experienced at Quanex could be deemed "second-hand harassment" as to Jackson. *Adusumilli*

*v. City of Chicago*, 164 F.3d 353, 362 (7th Cir.1998).

S.Ct. at 370. In reliance upon this logic, we have joined many of our sister circuits in making clear that "the conduct underlying a sexual harassment claim need not be overtly sexual in nature." *Williams*, 187 F.3d at 565. Similarly, even though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact that the plaintiff was African American. *See Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1273 (7th Cir.1991). Indeed, a showing of the use of racial epithets in a work environment may "create an inference that racial animus motivated other conduct as well." *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. Apr.20, 1999).

■ In this case, Jackson presented evidence that Stone had used a racial epithet against her and brought a false accusation against her only days after his suspension in the matter, and evidence that another African–American tub cleaner also had a problem with tampering with acid valves. Taken together with all of the other circumstances at Quanex, this evidence was probative as to whether Jackson suffered harassment even where the conduct she complained of was unaccompanied by direct references to race. Faced with such evidence, the district court should have done more than simply dismiss incidents that did not directly affect the plaintiff standing before it or incidents that did not carry explicit racial overtones; an examination of the totality of the circumstances required the district court to determine whether the incidents were happening only to employees of the protected class, and why to no one else. *See Andrews*, 895 F.2d at 1485.

■ Finally, we turn to what is potentially the most disturbing judgment in this case: the district court's decision to minimize proof of persistent racial slurs and graffiti at Quanex as "conventional conditions on the factory floor, sometimes described as conduct which is merely offen-sive." While the Court has noted that "'simple teasing,' offhand comments, and isolated incidents" ordinarily do not amount to discrimination under Title VII, *see Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998), an abundance of racial epithets and racially offensive graffiti could hardly qualify as offhand or isolated. Rather, such continuous conduct may constitute severe and pervasive harassment. *See, e.g., Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir.1985) (noting that "continuing use of racial or ethnic slurs would violate Title VII"); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981) ("Unquestionably, a working environment dominated by racial slurs constitutes a violation of Title VII.").

Thus, the district court was wrong to condone continuing racial slurs and graffiti on the grounds that they occurred in a blue collar environment. We have deemed such reasoning illogical in the context of sexual harassment, "because it means that the more hostile the environment, and the more prevalent the sexism, the more difficult it is for a Title VII plaintiff to prove that sex-based conduct is sufficiently severe or pervasive to constitute a hostile work environment." *Williams*, 187 F.3d at 564. We have likewise rejected the view that racial slurs and graffiti that are "part of the every-day banter on the shop floor" cannot constitute racial harassment, finding that evidence of regular incidents of graffiti and slurs may instead support a jury finding that a work environment was racially hostile because the conduct was not isolated, and the employer knew of it and did little to correct the problem. *See Moore*, 171 F.3d at 1079. In accordance with these cases, we squarely denounce the notion that the increasing regularity of racial slurs and graffiti renders such conduct acceptable, normal, or part of "conventional conditions on the factory floor."

**B.**

Having chiseled this case down to the incidents "in which she was a party and

which had racial implications," the district court proceeded to determine that Jackson did not report some of the conduct or incidents she found offensive, and that Quanex adequately responded to those that were reported. Specifically, the district court credited the decision of Quanex management to give Dwight Miller a warning for his reference to the level of bonderite sludge as "ass deep to a tall nigger." Additionally, the district court credited the decision of Quanex management to resolve the altercation in which Stone called Jackson a "nigger bitch" by giving both parties a suspension, finding that Jackson had not used the term "nigger" in her initial descriptions of the altercation and that "there is no genuine issue of fact that management dealt with the issue promptly and appropriately." Because the district court utterly failed to apply currently prevailing standards of employer liability to this case, we must again take issue with the judgment of the district court in this matter.

 As we explained earlier, an employer is vicariously liable "for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Ellerth*, 118 S.Ct. at 2270. Where, as here, no tangible employment action is taken, an employer may raise an affirmative defense to liability by proving, by a preponderance of the evidence, that (1) it exercised reasonable care to prevent and correct promptly any racially harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of corrective opportunities provided by the employer. *See id.* As for the acts of co-workers, a plaintiff may hold an employer directly liable if she can show that the employer knew or should have known of the conduct, and that its response manifested indifference or unreasonableness. *See Blankenship*, 123 F.3d at 873 (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 805 (6th Cir.1994)). Significantly, a court must judge the appropriateness

of a response by the frequency and severity of the alleged harassment. *See Erebia v. Chrysler Plastic Prods. Corp.*, 772 F.2d 1250, 1252–53 (6th Cir.1985). Generally, a response is adequate if it is reasonably calculated to end the harassment. *See Intlekofer v. Turnage*, 973 F.2d 773, 778 (9th Cir.1992) (citing *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983)).

 At the outset, we must address the district court's reference to the fact that to be actionable, racially harassing conduct "must be reported." Significantly, nowhere do the above delineated standards specify that the plaintiff, or any other individual, must "report" the offensive conduct of co-workers to the employer. Rather, to succeed, the plaintiff must establish that the employer "knew or should have known" of the offenses. The case at hand illustrates the relevance of this distinction, since, particularly as to the slurs and racial graffiti presumably perpetrated by co-workers and hostile to Jackson, it is important to observe that although Jackson herself did not report every instance of what she saw to management, other African–American employees testified that they did report them to management. Wardlaw wrote a letter to Quanex management complaining about the continuing use of racial slurs and graffiti in the plant. Moreover, in cases such as this, where harassment is pervasive, courts may impute constructive notice to an employer. *See Williamson v. City of Houston*, 148 F.3d 462, 465 (5th Cir.1998). Employees testified that much of the offensive graffiti was in restrooms commonly used by workers and supervisory foremen alike. Indeed, Ferguson, a supervisor, admitted his awareness of such graffiti and of racially motivated conduct.

Despite this knowledge, Quanex was slow to eliminate racially offensive graffiti when it learned of it, and made no effort to discover the perpetrators. Consequently, the graffiti continued throughout the entire period of time that Jackson worked at Quanex. These were not actions reason-

ably calculated to end racially offensive conduct. For example, although Ferguson learned that there was an "artist" in the west end of the plant who was responsible for the racial graffiti, including graffiti relating to the salamander incident Copeland reported to management, he did not inquire as to who the "artist" was, made no effort to discover who the "artist" was, and could not recall whether he reported the information to anyone else. (J.A. at 2192.) Instead, on the issue of offensive graffiti, Ferguson's response to the African–American employees in the plant was "[y]ou know where we are and you know what's going on." (J.A. at 760–61.) Similarly, Ferguson testified that he often heard of incidents of the use of racial harassment or slurs in the plant and that Thomas Miller approached him frequently with accounts of racially offensive behavior at the plant.[5] It seems clear that Quanex knew or should have known of the frequent occurrence of racial graffiti and slurs, and did little or nothing to stop it—indeed, Quanex's response to this problem "manifests indifference or unreasonableness" in light of the facts it knew or should have known. *Blankenship*, 123 F.3d at 873.

Although the district court found that Quanex took prompt action on the two occasions Jackson reported misconduct, the mere fact of a quick response to reports of racially offensive conduct could not, without more, release Quanex from liability. As to the conduct of Dwight Miller, a supervisor, Quanex bore the burden of proving that its action was a reasonable attempt to prevent and correct the problem of racially harassing behavior. Taking all of the circumstances of this case into consideration, we believe Quanex failed to carry that burden. While, when viewed in isolation, giving a reprimand to Dwight Miller might appear appropriate,

Jackson proffered evidence showing that Dwight Miller, a supervisor with Quanex since 1970, regularly used racial epithets or made demeaning remarks about African–American co-workers, and treated African–American workers on his shifts more harshly than other workers. The record also contains substantial evidence showing that Quanex management was aware of the fact that Dwight Miller discriminated against African–American workers. Edward Copeland wrote a letter to management in 1992 complaining about Dwight Miller's remark that "no nigger was going to bump a white woman," and had received no response. Dwight Miller testified that in response to his comment about the sludge, the plant manager told him such conduct was not acceptable "anymore." Reasonable minds could surely have differed as to whether Quanex exercised reasonable care to correct racial harassment when it merely reprimanded a supervisor whose offensive conduct was known to management.

As to the altercation between Donnie Stone and Jackson, the district court mistakenly presumed that because there was some conflict in testimony regarding whether Stone actually used a racial slur, the incident was not racially motivated and that thus, the decision of management to suspend both employees was reasonable. However, as we have explained, alleged incidents of racial harassment must be viewed against all of the circumstances and not in isolation. Moreover, even if there was some question as to whether Stone used a racial slur, Jackson's allegation of harassment extends beyond the conduct of Stone to the handling by management of her complaint that Stone physically assaulted her. Indeed, although Stone did not dispute that during their argument he grabbed the crane box Jackson had around

---

5. Curiously, Ferguson dismissed most of these accounts as rumors. For example, he heard that "there was a white male employee in the west end who said he was being called nigger lover for eating in the cafeteria with ... black employees." (J.A. at 2187.) However, this account never developed into anything beyond "rumor" because Ferguson never reported it to human resources and never investigated it himself, even though he had an idea of who had made this complaint.

her waist, Quanex management predetermined that it would subject Jackson to punishment on the grounds that there were no witnesses to the incident.

■ Viewed against a pattern of unresponsiveness by Quanex to the complaints of its African–American employees, reasonable minds could differ as to whether management's decision not to investigate the incident or to take discipline against the one party who assaulted another constituted a discriminatory act. Evidence that Quanex never committed itself to resolving the allegations of its African–American employees is overwhelming. When Benson reported that a group of Caucasian workers had threatened him and called him a "nigger," Quanex management asked Benson not to tell anyone about the incident and undertook no investigation, while acknowledging that the threats were racially motivated. When Thomas Miller found his shirt defaced with "Nigger Sucker," Quanex conducted an investigation that produced no results, and then posted a bulletin reminding employees not to discriminate. When Clayton complained that a Caucasian worker attempted to forge a note in his handwriting that said "white bitch," his supervisor agreed but took no action against the Caucasian worker. When Wardlaw reported, on behalf of Fouts, to management that Shoaff had used a racial slur regarding Jackson, management took statements from Fouts and Shoaff, another supervisor about whom many African Americans had complained, and took no further action. Supervisors failed to train or falsely disciplined African–American workers in a situation more or less unchecked by upper management. Time and time again, African–American employees reported racial harassment to Quanex, only to receive, at best, the posting of a general bulletin against discrimination.

This pattern of unresponsiveness on the part of Quanex reminds us that if a remedy "is ineffectual, liability will attach .... an employer's actions will not necessarily

shield it from liability if harassment continues." *Fuller,* 47 F.3d at 1529. The posting of a bulletin appears to have been the only action Quanex ever took in response to any of the incidents of racially offensive behavior of which it was notified. Ferguson could not recall a single incident in which management disciplined an employee, either by written warning or discharge, for using a racial slur against any other employee. Wardlaw, a member of the Civil Rights Committee who reported to management on race issues and who complained in writing about the racially discriminatory practices of supervisors and co-workers in the plant, observed the following about Quanex management:

> It's just that they kept dragging their feet whenever it concerned something racial. To me, it felt like they just wanted things to just go away and nothing was going on out there that was racist.
>
> * * *
>
> Well, we did have different—to me, the way that the people were feeling out there, since they didn't think nothing had happened to the foremen, that, you know, racial slurs and graffiti was just kind of going on fluently out there.... Nothing was being done to the foremen. So if it's okay for the supervisors to do it, it's going to be okay for the employees to do it.
>
> * * *
>
> I felt as though more should have been done and I felt as though the people should have been aware of what was going on. There should have been a letter going out to the fact that they wouldn't accept this ... and to let people know that, "Hey, we are not going to let the supervisors do it, and we are not going to let you get away with it."

(J.A. at 1318–25.)

Even Ferguson ultimately concluded, and expressed to other management officials, that Quanex was not making suffi-

cient efforts to address racial harassment in the plant, stating:

> We had in the past placed notices on the bulletin boards of our equal employment policy. [In one case,] we brought in the crew and had a meeting with them. The graffiti, from my perception, was kind of a finger in the air at the meeting. I felt at that point we needed to increase the pressure by going on record that we were going to do something to those employees involved.... I thought we needed to take some positive action, because having another meeting or putting another piece of paper on the wall obviously was not working. It was less effective than what I hoped.

(J.A. at 1409.) Although Youngerman told Ferguson he would talk to other management officials, Ferguson never received a response. Ferguson repeated his concern when Quanex failed to take a stand in response to Donnie Stone's wearing of a swastika in the plant. He again heard no response.

Considering the severity of the racial harassment problem at Quanex, we believe the actions it took in response to complaints of harassment, including those raised by Jackson, did not represent an exercise of reasonable care aimed at correcting the problem of racial harassment, and manifested real indifference to the racial harassment of African–American employees in the plant. The evidence demonstrates that Quanex management adopted the attitude that everyone knew the plant was a "redneck" environment, and that therefore, racially offensive conduct taking place there was not harassment, but conduct African–American employees had to accept as part of life at Quanex. There could hardly be a response more insensitive or insulting, to African Americans and Caucasians alike. Just as "[w]e do not believe that a woman who chooses to work in the male-dominated trades relinquishes her right to be free from sexual harassment," *Williams*, 187 F.3d at 564, we do not believe that an African American who chooses to work in a Caucasian-majority factory relinquishes her right to be free from racial harassment.

As one court has observed, "[a]n employer whose sole action is to conclude that no harassment has occurred cannot in any meaningful sense be said to have 'remedied' what happened. Denial does not constitute a remedy." *Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir.1995). Most remarkably, the attitude of Quanex demonstrates that rather than remedying the problems of racial harassment at the plant, Quanex management conceded discrimination in the "terms and conditions of employment" for its African–American employees. Thus, we believe it is clear that Quanex exhibited indifference rising to an attitude of permissiveness that amounted to discrimination. *See Blankenship*, 123 F.3d at 873.

## C.

Additionally, we believe that the district court needlessly placed great emphasis on the fact that Jackson did not prove that she suffered detrimental psychological effects on the job as a result of the racial harassment she suffered. We have held that to show a racially hostile working environment, a plaintiff must establish "that the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the reasonable employee's ability to do his or her job." *Davis*, 858 F.2d at 349. However, in *Harris*, the Court observed that "[t]he effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." 510 U.S. at 23, 114 S.Ct. 367. *Harris* makes clear that Jackson's failure to show that the hostile work environment she alleged psychologically affected her performance on the job was not fatal to her case. There, the

Court found that the district court had "erred in relying on whether the conduct 'seriously affect[ed] plaintiff's psychological well-being' or led her to 'suffe[r] injury,'" and warned that such inquiry would "needlessly focus the factfinder's attention on concrete psychological harm, an element Title VII does not require."[6] *Id.* at 22, 114 S.Ct. 367 (citations omitted).

In any event, Jackson testified that the racially hostile incidents that she experienced and witnessed disturbed her, and that she sought psychological treatment as a result—she therefore sufficiently established that the environment affected her. *Cf. Boutros v. Canton Reg'l Transit Auth.*, 997 F.2d 198, 203–04 (6th Cir.1993) (finding that although plaintiff's work performance did not fail, it was affected where plaintiff testified he felt "very, very bad"). Jackson also testified that as a result of the false accusation by Stone and Knerr, an incident she perceived as discriminatory, she had to go to the clinic because she started shaking and feeling really bad, and that she began having nightmares about Stone. Moreover, to the extent that Jackson alleged that she was racially harassed when someone continuously tampered with the acid valves as she worked as a tub cleaner, Jackson established that the harassment made it more difficult for her to do the job. Consequently, the district court faltered in requiring Jackson to show that she was forced to take sick leave before her ultimate departure or that she was otherwise affected at work by the hostile work environment she alleged.

## D.

Before concluding, we must pause to address the argument that the incidents upon which Jackson relies in this action were barred by the three-year statute of limitations applicable to § 1981 and Elliott–Larsen Act claims.[7] Although Quanex argued this point below, the district court did not explore or make findings on the issue, stating only in passing that incidents giving rise to a hostile work environment "must be within the limitations period." (J.A. at 2265.) This conclusion was not necessarily correct. Michigan courts apply the doctrine of "continuing violation" in discrimination cases, and this Court has held that the doctrine is of particular relevance where a plaintiff "alleges that the hostile racial environment that damaged him psychologically developed over the years out of a series of incidents." *Bell v. Chesapeake & Ohio Ry. Co.*, 929 F.2d 220, 223 (6th Cir. 1991) (per curiam) (citing *Sumner*, 398 N.W.2d at 377). Application of the "continuing violation" doctrine is appropriate where a plaintiff has demonstrated a policy of discrimination or a continuing course of discriminatory conduct. *See Sumner*, 398 N.W.2d at 378. As a threshold requirement to each of these theories of the "continuing violation" doctrine, the plain-

---

6. Significantly, this Court has issued decisions in Title VII harassment cases placing dispositive emphasis on a plaintiff's ability to prove that her work performance was adversely affected by unlawful workplace hostility. *See, e.g., Harrison v. Metropolitan Gov't of Nashville and Davidson County*, 80 F.3d 1107, 1118 (6th Cir.1996). However, these decisions erroneously relied on cases decided by this Court before *Harris*. Notably, *Harris* originated from this Court; in reversing, the Supreme Court expressly rejected the then-prevailing Sixth Circuit precedent upon which this Court and the Middle District of Tennessee had relied. *See Harris*, 510 U.S. at 20, 114 S.Ct. 367 (abrogating *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 620 (6th Cir.1986)).

7. Although § 1981 does not provide a statute of limitations, the Supreme Court has held that actions arising under § 1981 are governed by the state law statute of limitations for an analogous cause of action. *See Board of Regents v. Tomanio*, 446 U.S. 478, 483–84, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). Thus, the three-year statute of limitations applicable to Elliott–Larsen actions is also applicable to § 1981 actions in Michigan. *See* Mich. Comp. Laws Ann. § 600.5805(8) (West Supp. 1999); *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 315 (6th Cir.1975), *vacated on other grounds*, 431 U.S. 951, 97 S.Ct. 2668, 2669, 53 L.Ed.2d 267 (1977); *Duke v. Pfizer, Inc.*, 668 F.Supp. 1031, 1040 (E.D.Mich.1987).

tiff must show that at least one discriminatory act took place within the limitations period. *See id.*

■ As a preliminary matter, Jackson has clearly alleged the occurrence of discriminatory acts during the limitations period, which reaches back to February 1992—for example, the incident where Dwight Miller used a racial slur at a meeting occurred on January 22, 1993. Moreover, as discussed above, Jackson alleged a longstanding and demonstrable policy on the part of Quanex of tolerating a racially hostile environment in which racial graffiti and slurs and the disparate treatment of African–American workers took place regularly, with little or no response by management. *Cf. Dixon v. Anderson,* 928 F.2d 212, 217 (6th Cir. 1991). Additionally, the incidents of harassment alleged by Jackson, particularly the use of slurs and prevalence of racist graffiti in the plant, illustrate a continuing course of conduct in that they were similar in type and recurred frequently, and in that they continued up to, including, and after the time Jackson left Quanex. *Cf. Sumner,* 398 N.W.2d at 382 (citing *Berry v. Louisiana State Univ. Bd. of Supervisors,* 715 F.2d 971, 981 (5th Cir. 1983)); *see also Alexander v. Local 496,* 177 F.3d 394, 408–09 (6th Cir.1999) (observing that a "continuing violation" exists when a policy of discrimination is longstanding or related discriminatory acts continue into the limitations period). Application of the continuing violation doctrine is warranted here, where Jackson reasonably did not become aware of the need to vindicate her rights until after some time elapsed and she discovered she was the victim of a continuing policy or pattern of discrimination. *Cf. Bell,* 929 F.2d at 224 (citing *Berry,* 715 F.2d at 981).

In any event, the Supreme Court has observed that even evidence of conduct that is time-barred "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *see also Cortes v. Maxus Exploration Co.,* 977 F.2d 195, 199–200 (5th Cir.1992). As we have noted, evidence of acts occurring before the limitations period were relevant to determinations of whether the environment at Quanex was objectively or subjectively hostile, and of whether the response of Quanex management to alleged harassment was reasonable in light of what it knew or should have known. Accordingly, we reject the contention that evidence of prior discriminatory acts could play no role in the determination of whether Jackson became the victim of a racially hostile work environment.

## IV.

We believe the district court erred in taking the case away from the jury and granting Defendant judgment as a matter of law. Consequently, we REVERSE the judgment of the district court and REMAND for a new trial on Jackson's claims for racially hostile work environment brought under 42 U.S.C. § 1981 and under the Elliott–Larsen Act.