**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0652n.06

No. 12-6318

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Jul 17, 2013
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ANTHONY D. NICHOLSON, | ) | |
| | ) | |
| **Plaintiff - Appellant,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| CITY OF CLARKSVILLE, | ) | |
| TENNESSEE | ) | |
| | ) | **OPINION** |
| **Defendant - Appellee.** | ) | |
| | ) | |

**Before: ROGERS and KETHLEDGE, Circuit Judges; BORMAN, District Judge.**[*]

**PAUL D. BORMAN, District Judge.** Plaintiff-Appellant Anthony D. Nicholson ("Nicholson"), who is an African-American, was formerly employed in the Parks and Recreation Department with the Defendant-Appellee City of Clarksville ("Clarksville"), Tennessee. He alleges that, while employed by Clarksville, he was subjected to a racially hostile work environment, was denied promotions based on his race, and was subject to retaliatory actions after he complained about racial discrimination.

Nicholson filed a complaint in the United States District Court for the Middle District of Tennessee on April 13, 2011, and an Amended Complaint on July 21, 2011. Nicholson alleged three

_____

[*]The Honorable Paul D. Borman, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

claims: (1) constitutional violations under 42 U.S.C. §§ 1981 and 1983; (2) violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; and (3) violation of the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.* (2011).

On October 5, 2011, the district court granted Clarksville's Motion for Partial Judgment on the Pleadings, dismissing Nicholson's claims under § 1983 and the THRA as barred by the applicable statute of limitations. Nicholson did not appeal this Order. Thus, only the Title VII claim remained at issue.

On July 2, 2012, Clarksville filed a Motion for Summary Judgment. On September 12, 2012, the district court entered a Memorandum Opinion and Order granting Clarksville's Motion for Summary Judgment. Nicholson filed a timely appeal on October 12, 2012.

For the reasons that follow, we **AFFIRM** the district court's judgment.

I.

Nicholson began working for Clarksville's Parks and Recreation Department in 2004 as a part-time, seasonal employee, and was later promoted to a full-time "Maintenance I" position. Nicholson claims that he witnessed, experienced or had knowledge of several different incidents during his employment with Clarksville that evidence hostility towards African-American employees.

**A. 2005 Incident**

Sometime in 2005, a Caucasian assistant director for the Parks and Recreation Department addressed a group of employees, including Nicholson, by stating that if the employees did not complete their work their "asses were fired." (R. 38, Resp. to Clarksville's Statement of Undisputed

2

Material Facts ("SUMF") ¶ 4, Page ID # 477.)  The group of employees that the assistant director addressed with this comment included a Caucasian employee, Maintenance Department Supervisor Garry Harp.  Nicholson was not disciplined in connection with this incident.

**B.  2007 Job Reassignment, "Cussing" Incidents and Reprimand**

Nicholson's job assignment was changed in 2007 to Heritage Park, where he worked under a Caucasian supervisor named Richard Davis.  Nicholson claims that the Maintenance Director, James Crotty, told Davis to "work the shit out of [Nicholson] so that [Nicholson] would wind up quitting[.]" (R. 31-1, Exs. to Clarksville's Mot. for Summ. J., Nicholson Dep. 141, Page ID # 250.) Nicholson also claims that Davis hired a part-time employee named Bill, who "was, basically, there to watch [Nicholson] to see if he could find anything out on [Nicholson]."  (Nicholson Dep. 141, Page ID # 250.)

Also in 2007, Nicholson claims that he was "cussed" by a white supervisor named James Clark for returning late from a lunch break.  Nicholson testified that he was told to ride with a Caucasian employee, Tim Bishop, during his lunch break, and that even though Bishop was responsible for taking too long to return after lunch, Clark "cussed" Nicholson.  (Nicholson Dep. 128-29, Page ID # 242-43.)  Nicholson received a written reprimand for this incident, which stated that Nicholson was sitting in his truck, not Bishop's, and that when Clark asked Nicholson to return to work, Nicholson responded "'who the hell are you talking to,' and proceeded arguing." (Nicholson Dep., Ex. 11, Reprimand Memo, Page ID # 261.)  Bishop did not receive a reprimand. Nicholson testified that Clark later apologized and that the issue was resolved.

> A.    I was told to ride with [Bishop]. So in the meantime, he was the driver of the truck, and it was his truck. Then we got back to the park. Why is -- James [Clark] came to me with it. James came to me, cussing me. And later, James apologized, and we was okay about it.
>
> Q.    Resolved it?
>
> A.    Yes sir.

(Nicholson Dep. 129, Page ID # 243.)

Nicholson clarified at his deposition that his use of the word "cussed" refers to "[l]ittle stuff[,]" like coarse and "aggressive" language, and does not include racial slurs.

> Q.    Now, when you say "cussed," I mean, like -- you made reference several times to, get your ass out here or get your ass back to work, or you know, what the hell you doing. Is that the kind of stuff you're talking about?
>
> A.    Yeah. Little stuff like, you know, you can say other stuff with it. I just can't recall what all was said, but it was cussing.
>
> . . . .
>
> A.    Yeah. If they use it -- I mean, it's a certain time -- if you use it jokingly, okay, that's fine. But aggressively, no, it's not fine.

(Nicholson Dep. 131, 133, Page ID # 241, 239.)

## C. Marlon Matthews Incidents

Nicholson also testified that he witnessed an incident where an African-American employee, Marlon Matthews, was "cussed" by a Caucasian employee, John Walk. Nicholson could not recall what Walk said to Matthews, and only remembered that it was "something dealing with work." (Nicholson Dep. 131, Page ID # 241.)

4

Matthews admitted at his deposition that he used racially derogatory language while working, and that he and Walk were "good friends" who "joke around." (R. 31-4, Exs. to Clarksville's Mot. for Summ. J., Matthews Dep. 24-25, Page ID # 332-33.) Matthews stated that "pretty much everybody" he worked with used racial slurs, and that "[s]ome of it is not on a serious term." (Mathews Dep. 24, Page ID # 332.) Mose Garrett, an African-American employee, also testified that "both African-American employees and Caucasian employees use the N-word[,]" and that it is most often used by employees who are "trash talking, [and] joking around." (R. 40-5, Exs. to Nicholson's Resp. to Clarksville's Mot. Summ. J., Garrett Dep. 21, Page ID # 540.) Matthews testified that "one particular person" used racially derogatory language around Matthews, and "[c]alled [Matthews] the N-word" to his face. (Matthews Dep. 19, Page ID # 330.) Matthews reported this individual to Maintenance Director James Crotty and the individual was terminated for the incident.

**D. Crotty Incidents**

Nicholson claims that a Caucasian employee named Dutch Crotty, who was the brother of Maintenance Director James Crotty, used racial slurs. Specifically, Nicholson witnessed an incident in 2007 in which Dutch Crotty called a Caucasian female employee who was in a relationship with an African American a "nigger lover." (Resp. to Clarksville's SUMF, ¶ 10, Page ID # 478.)

An African-American employee named Donald Carney testified that he twice complained to James Crotty about Dutch Crotty's use of racial slurs and racially derogatory jokes. Carney testified that he was fired by James Crotty the first time Carney complained about Dutch Crotty. However, after Carney spoke to the Mayor of Clarksville, he was allowed to work for the remainder of the season.

Carney complained about Dutch Crotty a second time after Carney heard Dutch refer to a Caucasian female employee as a "nigger lover." James Crotty suspended both Carney and Dutch Crotty after this incident. Carney was not rehired as a seasonal employee the next year, but he was later re-hired as a regular, full-time employee.

Nicholson claims that, in 2007, he heard James Crotty refer to an African-American employee as "blue." Nicholson testified that he believed Crotty's use of the word "blue" was offensive and derogatory, because it referenced the employee's skin color: "It was the color of his skin. He was real dark." (Nicholson Dep. 109, Page ID # 549.) Clarksville employee Kevin Cowling also testified that he believed "blue" was a racial slur when Crotty used the term. (R. 40-2, Exs. to Nicholson's Resp. to Clarksville's Mot. Summ. J., Cowling Dep. 92, Page ID # 525.)

James and Dutch Crotty were both terminated in November 2008 after an incident involving money received from the sale of scrap metal. Nicholson testified that he was aware of the incidents between Dutch Crotty and Carney, and believed that Carney was fired in connection with those incidents. Carney also testified that Dutch Crotty was the only employee he ever heard using racial slurs, and that he was satisfied with the way Clarksville handled the "situation" with Dutch Crotty. (Carney Dep. 18, 32, Page ID # 314, 318.)

**E. Song Lyrics Incident**

At his deposition, Nicholson recalled an incident where he was riding with a Caucasian employee, who was Garry Harp's nephew, "[a]nd he was listening to a song, and he kept on -- and the song had the N-word, and he kept on saying the N-word." (Nicholson Dep. 147, Page ID. # 252.) Nicholson asked the employee to stop using the "N-word," and the employee stopped using the word

around Nicholson. (*Id.*) While the employee never used the word around Nicholson again, Nicholson claims that he "heard he did it again." (Nicholson Dep. 147-48, Page ID # 251-52.)

**F. Segregated Work Crew**

Nicholson testified that, in 2008, he believed that a work crew at Heritage Park was segregated by race by assigning the Caucasian employees to work on the soccer fields, on one side of the park, and assigning the African-American employees to work on the baseball fields, on the other side of the park. In response to Clarksville's Interrogatories, Nicholson claimed that he complained to Clarksville management about the segregated work crew, but that "nothing was ever done." (R. 31-2, Nicholson's Resp. to Clarksville's Interrogatories ¶ 8, Page ID # 300.) However, Nicholson does not dispute that Maintenance Department Supervisor Garry Harp spoke with maintenance workers regarding the alleged segregation, and that "[Nicholson] and other maintenance workers told Harp that the workers chose their own work area based on what they wanted to do and who they wanted to work with, and that work assignments were not assigned based on race." (R. 31-8, Exs. to Clarksville's Mot. Summ. J., Harp Decl. ¶ 11, Page ID # 411; Resp. to Clarksville's SUMF ¶ 44, Page ID # 483.)

Clarksville employee Lorenzo Wells testified that he worked on the baseball field because "[he] knew more about softball. [H]e really didn't know too much about soccer at all." (R. 31-9, Exs. to Clarksville's Mot. Summ. J., Wells Dep. 21, Page ID # 415.) Wells also stated that he has asked Caucasian employees to help him with work on the baseball fields, and he has been asked to help on the soccer fields. Mose Garrett likewise testified that he has worked on both the soccer fields and baseball fields in the past.

7

**G. 2008 Incidents**

James Crotty changed Nicholson's work assignment to the "trash truck" in 2008. Nicholson testified that "at that time, I was going through my divorce, and [Crotty] knew, as far as I was trying to get my kids as much as I could. And out there at Heritage, you work a lot of weekends. So he was, basically, trying to break me down." (Nicholson Dep. 142, Page ID # 249.) Nicholson claimed that he was required to log his hours and stay for a full eight-hour day while working on the trash truck, while other employees were not required to log their hours, and would get paid for eight hours after only working for four. James Crotty advised Nicholson that he would watch videos to make sure that Nicholson worked the full eight hours while assigned to the trash truck. Nicholson worked on the trash truck for "a couple weeks" before he was taken off that assignment. (Nicholson Dep. 142, Page ID # 249.)

Also in 2008, Nicholson witnessed Charlie Moody, a Caucasian employee, "physically kick an African American employee, Mose Garrett, in the butt." (Resp. to Clarksville's SUMF ¶ 28, Page ID # 481.) A Caucasian supervisor witnessed the incident and laughed, but took no disciplinary action. Nicholson later heard Moody say that he "was just playing with" Garrett (Nicholson Dep. 136, Page ID # 236), and Garrett testified that Moody apologized for the incident three or four times, that his apology was sincere, and that the incident never happened again.

**H. Noose Incidents**

In November 2008, a maintenance crew found a noose hanging from a tree in a Clarksville park. Clarksville employee Marlon Matthews also found a noose in his work truck earlier that year.

Nicholson believed that a third noose was also found, but could not recall any details at his deposition.

Derrick Oliver, an African-American park ranger with the Clarksville Parks and Recreation Department, conducted an investigation to determine who was responsible for hanging the nooses. A second investigation was also conducted by Bronson Gibbs, Clarksville's Risk Manager. In addition, Clarksville's request that the Tennessee Bureau of Investigations perform its own investigation was granted. Nicholson stated that he was never interviewed as part of any of the investigations, but also conceded that he did not have any direct knowledge of who was responsible for hanging the nooses. None of the investigations were able to identify the individual(s) responsible for hanging the nooses.

In response to the noose incidents, Clarksville also initiated a city-wide sensitivity training program titled "Diversity and You." (Resp. to Clarksville's SUMF ¶ 38, Page ID # 482.) Nicholson attended this training on February 10, 2009. Marlon Matthews testified that the Diversity and You training caused him to "curb[ his] language a whole lot after that." (Matthews Dep. 35, Page ID # 336.)

## I. Orville Sykes Incident

In January 2009, a Caucasian supervisor named Orville Sykes "cussed" Nicholson while Nicholson was cutting down a tree with a chainsaw. Sykes told Nicholson, "boy you don't know what you doing [sic]," and told Nicholson to "get [his] ass out of here." (Nicholson's Resp. to Clarksville's Interrogatory Request ¶ 13, Page ID # 304; Nicholson Dep. 65, Page ID # 217.) After Sykes gave Nicholson "a verbal resume[,]" Nicholson turned off his chainsaw and handed it to

Sykes. (Nicholson Dep. 65-66, Page ID # 216-17.) Nicholson testified: "Orville Sykes was telling me about, hey, I've been chopping down trees for this long, that long. . . . So I figured he got more experience, so I cut [the chainsaw] off; handed it to him." (*Id*.) When Sykes began asking for Nicholson's name, Nicholson refused to answer because Sykes did not address him directly. The Manager of Operations and Planning for the Parks and Recreation Department, Kevin Cowling, issued Nicholson a verbal reprimand for refusing to tell Sykes his name. However, Nicholson testified that Cowling "said he would take care of [the reprimand], and I never knew -- I never heard anything else about that." (Nicholson Dep. 66, Page ID # 216.)

**J. Denial of Promotions**

In May and October of 2009, Nicholson applied for two separate promotions to a Maintenance Worker II position. Nicholson could not recall at his deposition whether he was interviewed for the Maintenance Worker II positions in 2009, but he did recall that he was previously interviewed for a Maintenance Worker II position. (Nicholson Dep. 47, Page ID # 543.) Clarksville contends that Nicholson was interviewed for the May 2009 position. Nicholson did not receive either promotion.

Maintenance Department Supervisor Garry Harp stated that Nicholson was not selected for either Maintenance Worker II position because he "did not possess all the skills necessary for the Maintenance II position, such as welding and plumbing." (Harp Decl. ¶ 6, Page ID # 410.) Harp further attested to two opportunities that he had given Nicholson to demonstrate his welding and plumbing skills:

> One time, I allowed Mr. Nicholson to weld a broken gate [at] the fair grounds. Mr. Nicholson did not repair it correctly the first time, and I gave him a second chance to do it. In total, Mr. Nicholson took two days to weld the gate, requiring me to give him overtime pay, and the gate was still not properly repaired when he finished. Then, I asked Marlon Matthews, a Maintenance II employee, to repair it and he fixed it correctly in a very short period of time.
>
> Another time, Mr. Nicholson attempted to repair a faucet to demonstrate his basic plumbing skills, which are also required of a Maintenance II worker. He took the fixture apart, but was unable to repair or put it back together. He left the faucet open and disassembled overnight before telling me the next day that he could not fix it.

(Harp Decl. ¶¶ 7-8, Page ID # 410.)

Nicholson admitted that the gate broke the first time he tried to fix it. However, Nicholson avers that he told Harp that he could not fully repair the gate initially because he needed additional parts. Nicholson also admitted that Marlon Matthews put the gate up again later, but claims that it broke again afterward. Nicholson believes that the gate was breaking because "somebody was . . . just hitting it or something." (Nicholson Dep. 49, Page ID # 544.) Nicholson also stated that he was told he did not get the two Maintenance Worker II promotions because he had high blood pressure and because his Commercial Drivers License was invalid.

Nicholson stated that he spoke to Garry Harp about a Maintenance Worker II position that he applied for in 2010, and Harp told Nicholson that he did not receive the position because of a back injury Nicholson had sustained while working. Nicholson also spoke to Garry Harp about a supervisor opening, and Harp told Nicholson not to apply for the position "because [he] wouldn't get it." (Nicholson's Resp. to Clarksville's Interrogatories ¶ 9, Page ID # 302.)

11

Mose Garrett testified that he had previously applied for a Maintenance Worker II position, but a Caucasian employee named Tommy Little, who only had experience in swimming pool maintenance, received the promotion instead. However, it is undisputed that other African-American employees were promoted. Marlon Matthews was promoted from a Maintenance Worker I to a Maintenance Worker II position. In 2010, an African-American employee named William Humphrey was promoted from Maintenance Worker I to a supervisory position as Department Crew Chief.

In September 2010, Nicholson received a performance evaluation from his supervisor, Richard Davis, rating his performance as "meets expectations." (Resp. to Clarksville's SUMF ¶¶ 111-12, Page ID # 494.) Davis changed his rating of Nicholson to "unsatisfactory" after Cowling told Davis that the evaluation should reflect Nicholson's performance throughout the entire year. Cowling testified that he did not believe Davis's initial evaluation of Nicholson as "meets expectations" was accurate, because "Mr. Davis had expressed to [Cowling], on several occasions throughout the year, that, you know, he had problems with [Nicholson] not wanting to do some things, or not communicating, or asking why other people couldn't do that if he didn't want to do something." (Cowling Dep. 108-09, Page ID # 406-07.) Nicholson was terminated in 2011.

## II.

This Court reviews a district court's grant of summary judgment *de novo*. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008). Summary judgment is proper under Fed. R. Civ. P. 56(a) where "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." The facts must be viewed, and all reasonable

inferences must be drawn, in favor of the nonmoving party. *Pennington v. State Farm Mut. Auto Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The Court must ultimately determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

III.

Nicholson argues that the district court erred when it found no genuine issue of material fact as to Nicholson's hostile work environment, failure to promote, and retaliation claims.  Nicholson contends that the discrete incidents of harassment he has alleged, when considered under the totality of the circumstances, were sufficient to alter the terms and conditions of his employment with Clarksville.  Nicholson also argues that there is a genuine issue of material fact as to whether Clarksville's claimed reasons for denying him promotions were pretextual, and that Clarksville engaged in retaliatory conduct in response to Nicholson's formal and informal complaints about racial discrimination in the workplace.

## A.  Hostile Work Environment

Nicholson's hostile work environment claims under § 1981 and Title VII are subject to the same standards. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).  To establish a hostile work environment claim, Nicholson must show "(1) he was a member of a protected class; (2) he was subject to unwelcomed harassment; (3) the harassment was race-based; (4) the harassment unreasonably interfered with his work performance by creating an environment that was intimidating, hostile, or offensive; and (5) [Clarksville] was liable for the harassing conduct." *Kuhn*

*v. Washtenaw County*, 709 F.3d 612, 627 (6th Cir. 2013). The United States Supreme Court has noted that harassing conduct "must be extreme to amount to a change in the terms and conditions of employment[.]" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not create a hostile work environment. *Id*. (citation and internal quotation marks omitted). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Id*. (internal quotation marks omitted).

In evaluating a hostile work environment claim, the Court looks to the totality of the circumstances, "considering even those claims that were not directed at a particular plaintiff and those claims that a particular plaintiff did not witness." *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 718 (6th Cir. 2012). However, while a plaintiff need not be the subject of, or a witness to, harassing behavior, "he does need to know about it." *Id*.

Factors relevant to a hostile work environment claim "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

Relying on *Jackson*, *supra*, Nicholson argues that the actions taken by Clarksville employees and supervisors, when considered together, were sufficiently severe and pervasive to create a hostile work environment claim. In *Jackson*, the plaintiff, an African-American woman, produced evidence showing, *inter alia*, frequent use of racial slurs by co-workers and supervisors, racist graffiti in rest rooms depicting lynchings and the phrase "KKK is back," the phrase "Blacks out back" on a door

14

at the employer's plant for at least two years, defacement of an African-American employee's work shirt by writing the words "N----- Sucker" over his name, and different treatment for Caucasian and African-American employees in terms of on-the-job training and opportunities for advancement. *Jackson*, 191 F.3d at 651-54. The *Jackson* plaintiff was also called a "n----- bitch" and physically assaulted by a Caucasian co-worker. *Id*. at 655. After the plaintiff took a leave of absence due to the assault, the employee who had assaulted her came to work wearing a hard hat with a swastika on it. *Id*. Throughout the plaintiff's employment, her employer demonstrated "a pattern of unresponsiveness . . . to the complaints of its African-American employees[.]" *Id*. at 665. This Court found that, in considering the totality of the circumstances, including instances of racial harassment that were not directed specifically at the plaintiff, the trial court erred when it granted judgement as a matter of law in favor of the employer. *Id*. at 668.

Clarksville argues that Nicholson's evidence only shows isolated incidents of general profanity, and the few incidents involving racial slurs are insufficient to create a hostile work environment claim. Clarksville asserts that sporadic and isolated comments by employees cannot amount to "extreme" conduct that changes the terms and conditions of employment. Clarksville further argues that Nicholson's hostile work environment claim fails because he cannot show that Clarksville had knowledge of the alleged racial harassment and failed to act.

The district court properly determined that Nicholson had failed to establish a genuine issue of material fact on his hostile work environment claim. Most of the incidents relied on by Nicholson only involved coarse language used by Clarksville employees, and did not evidence racial animus.

Nicholson admits that the 2005 incident, where an assistant manager told a group of employees that their "asses were fired" if they did not complete their work, involved coarse language directed at both African-American and Caucasian employees. This incident, which involved no racial slurs, cannot be construed as evidencing a racially hostile work environment.

As to 2007, Nicholson cannot recall what language John Walk used when he "cussed" Marlon Matthews. Absent any indication of racial hostility, this incident does not support Nicholson's claim of a racially hostile work environment.

Nicholson claims that his 2007 written reprimand by his supervisor, James Clark, evidences racial animus, because Clark did not also reprimand Tim Bishop, Nicholson's Caucasian co-worker, who also arrived late after lunch. However, the reprimand submitted into evidence reflects that Nicholson was reprimanded for arguing with his supervisor, not for arriving late after lunch. Nicholson does not claim that Bishop also argued with Clark and was not reprimanded. Furthermore, Nicholson admits that Clark later apologized for the reprimand and the issue was resolved to Nicholson's satisfaction.

Similarly, there is no indication that the 2008 kicking incident involving Mose Garrett and Charlie Moody was motivated by racial animus, and Garrett testified that Moody sincerely apologized after the incident.

Although Nicholson initially complained about the alleged segregation of a work crew in 2008, he admits that he later told the Maintenance Department Supervisor that the work crew actually chose their own work assignments, and employees were not assigned to the baseball or

soccer fields based on their race. Further, there was testimony that each crew also worked on the other crew's field – baseball and soccer.

The evidence reflects four instances of racial slurs between the years 2007 and 2009. Only one of these incidents involved language specifically directed at Nicholson – the 2009 incident in which Orville Sykes referred to Nicholson as "boy." Nicholson was aware of two racial slurs in 2007 – Dutch Crotty referring to a female employee as a "nigger lover," and James Crotty referring to an African-American employee as "blue." Both Crottys were subsequently terminated by Clarksville. Nicholson also recalls an incident where he rode in a truck with a Caucasian employee and heard him singing along with a song that used the "N-word." When Nicholson asked him to stop singing along around Nicholson, the employee complied.

These four isolated instances over the course of two years, while inappropriate and offensive, are not so severe and pervasive as to alter the terms and conditions of Nicholson's employment. *See Farragher*, 524 U.S. at 788 (noting that "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"); *see also Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 327 (6th Cir. 2010) (affirming district court's grant of summary judgment on hostile work environment claim involving "a handful of uses of the n-word and its derivatives, . . . some racist jokes . . ., a few references . . . to the Ku Klux Klan and James Earl Ray, and the presence of racist graffiti that was removed as soon as [the plaintiff] reported it to a supervisor." (internal quotation marks omitted)).

Nicholson argues that the totality of circumstances should include Clarksville's failure to promote Nicholson, unwarranted disciplinary actions, and alleged retaliation. Even considering

these facts, however, Nicholson still fails to establish a hostile work environment claim. As discussed *infra*, there is no evidence that Clarksville denied Nicholson's requests for promotion to the Maintenance Worker II position because of Nicholson's race. Likewise, there is no evidence that any disciplinary actions taken by Clarksville were unwarranted, or that Nicholson was disciplined more harshly based on his race. Furthermore, if the 2008 noose incidents are considered as part of the totality of the circumstances, they are insufficient to support a hostile work environment claim because there is no evidence that Clarksville employees hung the nooses. Indeed, the undisputed evidence shows that the nooses were immediately removed after they were discovered, that Clarksville initiated two separate investigations seeking to identify the individual or individuals who hung the nooses, and also requested a third investigation from the Tennessee Bureau of Investigations. Further, the evidence establishes that in response to these noose incidents, Clarksville held a diversity sensitivity training program for its employees.

Nicholson testified that he was aware that Donald Carney was suspended after he complained about Dutch Crotty's use of racial slurs, and that Carney was not rehired by Clarksville as a seasonal employee the year after. However, Carney was later hired as a full-time, permanent employee at Clarksville. As noted *supra*, both Dutch Crotty and his brother, James Crotty, were terminated by Clarksville. Viewed as a whole, these facts do not imply a severe and pervasive hostility towards African-American employees.

Viewing the totality of the circumstances, Nicholson has failed to establish a genuine issue of material fact as to whether the discriminatory conduct alleged was so severe and pervasive that it altered the terms and conditions of Nicholson's employment. The district court therefore did not

err by entering summary judgment in Clarksville's favor on Nicholson's hostile work environment

claim.[1]

## B.  Failure to Promote

To establish a prima facie case of racial discrimination on a failure to promote claim,

Nicholson must establish that: "(1) he is a member of a protected class; (2) he applied and was

qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other

employees of similar qualifications who were not members of the protected class received

promotions." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000).  If Nicholson

establishes a prima facie case, he is entitled to a presumption of discrimination unless Clarksville

proffers "a legitimate, nondiscriminatory reason for its decision." *Id*. at 1021.  The burden then

shifts back to Nicholson to show that Clarksville's "proffered reason is pretextual." *Id*. (citing

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) and *St. Mary's Honor Ctr. v.*

*Hicks*, 509 U.S. 502, 510-11 (1993)).

Clarksville contends, in a footnote, that Nicholson has failed to establish a prima facie case

because he cannot show that he was qualified for the Maintenance Worker II position.  (Appellee's

Br. at 27 n. 15.)  This issue was similarly argued by Clarksville in the district court, which noted that

Clarksville "asserts in a single sentence, without any explanation, that the plaintiff failed to establish

a prima facie case of discrimination because he was not qualified for the open M2 positions."  (Sept.

---

[1]Because Nicholson's hostile work environment claim was properly dismissed by the district court, we do not address Clarksville's alternate argument regarding supervisor liability.

12, 2012 Memorandum Op. 18 n. 11, Page ID # 620.) Clarksville's assertion that Nicholson cannot establish a prima facie case is unsupported by any law or analysis, and is therefore waived. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (alterations and internal quotation marks omitted).

The argument in both Nicholson's and Clarksville's briefs focuses on whether Nicholson has produced evidence showing that Clarksville's proffered legitimate, nondiscriminatory reason is pretextual. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews*, 231 F.3d at 1021. Nicholson bears "the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [Clarksville's] explanation and infer that [Clarksville] intentionally discriminated against him." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (internal quotation marks omitted).

Clarksville asserts that Nicholson was not promoted to a Maintenance Worker II position because he failed to demonstrate the required welding and plumbing skills, and because he was argumentative and resisted directives from his superiors. Nicholson attempts to show that this reason is a mere pretext for discrimination by relying on several different facts.

Nicholson first contends that he made complaints to his supervisors regarding racial discrimination, and subsequently applied for promotions "but was not even interviewed each time." (Appellant's Br. at 30.) However, Nicholson admitted at his deposition that he had been interviewed

for a Maintenance Worker II position. (Nicholson Dep. 47, Page ID # 543.) Nicholson also does not dispute that a gate he was asked to fix collapsed after he tack welded it on two different occasions, and that it was ultimately fixed correctly by Marlon Matthews "in a very short period of time." (Resp. to Clarksville's SUMF ¶¶ 74-75.) While Nicholson stated that he believes that "somebody was . . . just hitting [the gate]" (Nicholson Dep. 49, Page ID # 544), Nicholson's subjective belief as to why the gate collapsed does not establish that Clarksville's reasons for denying Nicholson a promotion were a mere pretext in light of the undisputed facts in the record.

Nicholson also notes that Garry Harp told him not to apply for a promotion because he would not get it, but Nicholson does not show that Harp's comment was based on racial animus. This fact, standing alone, does not evidence that Clarksville's proffered reasons for denying Nicholson's promotions are a pretext.

Nicholson next appears to argue that one of the Caucasian employees who received a promotion to the Maintenance Worker II position was less qualified than Nicholson because he did not have a Commercial Drivers License ("CDL"), which was a requirement for the position. However, Clarksville's promotion of Marlon Matthews to a Maintenance Worker II position undermines this argument. Matthews, who is African American, was allowed to obtain a CDL after he was promoted. As stated by the district court, "to the extent that the defendant failed to consistently apply its requirement mandating possession of a commercial driver's license, it did so in such a way that both white and African American employees benefitted." (Sept. 12, 2012 Memorandum Op. 21, Page ID # 623.)

21

Nicholson argues that a genuine issue of material fact exists as to pretext based on the action of his supervisor, Richard Davis, changing his employee evaluation in 2010 from "meets expectations" to "unsatisfactory." Nicholson admits, though, that Kevin Cowling did not think the initial evaluation was accurate, and asked Davis to change Nicholson's evaluation to reflect his performance throughout the year. Nicholson does not produce any evidence tending to show that Cowling's request was based on racial animus.

Nicholson has failed to produce sufficient evidence to create an issue of fact as to whether Clarksville's proffered reasons for denying his promotion to the Maintenance Worker II position were pretextual. The district court's grant of summary judgment on Nicholson's failure to promote claim is therefore affirmed.

## C. Retaliation

To establish a prima facie case of retaliation, Nicholson must demonstrate by a preponderance of the evidence that (1) he engaged in a protected activity under Title VII, (2) Nicholson's protected activity was known to Clarksville, (3) Clarksville took adverse employment actions against Nicholson, and (4) there was a causal connection between the adverse employment action and the protected activity. *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (internal quotation marks omitted). If Nicholson establishes a prima facie case, Clarksville then has the burden of production and must articulate a legitimate, nondiscriminatory reason for its action. *Fuhr v. Hazel Park School Dist.*, 710 F.3d 668, 674 (6th Cir. 2013). "If a defendant successfully produces such a legitimate

reason, then the burden of production returns to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination." *Id*. at 675. Furthermore, the United States Supreme Court recently clarified that a Title VII plaintiff must demonstrate "but for" causation to sustain a retaliation claim.

> Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

*Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2013 WL 3155234, at *14 (June 24, 2013).[2]

Nicholson argues that he "made a number of complaints to his supervisors concerning racial discrimination in the workplace starting with his report of segregation in 2008." (Appellant's Br. 35.) However, Nicholson has not produced any evidence of further complaints he made about racial discrimination after he complained about the segregated work crew in Heritage Park. The district court nevertheless noted that "the record evidence shows that the plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 27, 2009." (Sept. 12, 2012 Memorandum Op. 25, Page ID # 627.) Therefore, Nicholson's complaint

---

[2]We need not address whether the *Nassar* holding regarding Title VII retaliation applies as well to Nicholson's § 1981 retaliation claim because Nicholson cannot satisfy even the causation requirement for Title VII retaliation claims under the pre-*Nassar* law that our Circuit has applied to § 1981 claims. *See Bobo v. United Parcel Servs.*, 665 F.3d 741, 756-57 (6th Cir. 2012) (analyzing Title VII and § 1981 claims for retaliation using motivating-factor standard and *Price Waterhouse* burden shifting).

regarding the segregated work crew in 2008 and his March 27, 2009 EEOC charge are the only protected activities at issue.

Clarksville argues that, assuming Nicholson's complaint in 2008 constitutes protected activity, Nicholson cannot show a "causal connection" between that protected activity and any alleged adverse employment actions.

Nicholson relies on temporal proximity to establish a causal connection between his protected activity and the alleged adverse employment actions taken by Clarksville. "One way by which a plaintiff can demonstrate a causal connection is to show close temporal proximity between the adverse employment actions and the protected activity." *Taylor*, 703 F.3d at 339. But a prima facie case based on temporal proximity alone requires a short period of time between the protected activity and the adverse employment action, "usually less than six months." *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000) (internal quotation marks omitted). As this Court noted in *Mickey*, *supra*:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

516 F.3d at 525. In *Cooper v. City of North Olmstead*, 795 F.2d 1265 (6th Cir. 1986), this Court found that "[t]he mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an [inference] of retaliation." *Id*. at 1272.

Regarding Nicholson's complaint about the segregated work crew, he states only that he made the complaint sometime in 2008 and has not produced evidence approximating a more specific date. Because Nicholson relies on temporal proximity to establish the causal connection element of his prima facie case of retaliation, he bears the burden of establishing temporal proximity by a preponderance of the evidence. *Taylor*, 703 F.3d at 336. Nicholson has failed to produce evidence even approximating when he made his complaint in 2008, and therefore cannot establish a prima facie case of retaliation with respect to his 2008 complaint.

The only other protected activity evidenced in the record is Nicholson's March 27, 2009 EEOC charge. After he filed this charge, Nicholson asserts that Clarksville engaged in adverse employment activities by declining to promote him in May and October of 2009, by changing his performance evaluation in September 2010, and by subjecting him to unwarranted disciplinary action.

The October 2009 denial of promotion occurred more than six months after Nicholson engaged in protected activity, and the changes to Nicholson's performance evaluation in September 2010 occurred 18 months after the protected activity. A time period greater than six months, without more, is not a sufficiently short period of time to satisfy the causal connection element of a retaliation claim. *See Cooper*, 795 F.2d at 1272; *see also Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 718 (6th Cir. 2007) (finding no causal connection where gap between protected activity and adverse employment action was six months); *Cecil v. Louisville Water Co.*, 301 F. App'x 490, 502 (6th Cir. 2008) (holding that adverse employment activity that occurred 10 months and 17

months after protected activity was insufficient, on its own, "to create a reasonable inference of causation.").

The approximately two-month gap between Nicholson's protected activity on March 27, 2009, and the denial of promotion in May 2009, may be sufficient to show a causal connection. *See Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) (holding that "[a] lapse of two months, as is the case here, is sufficient to show a causal connection, and the district court erred in holding otherwise."); *but see Warf v. U.S. Dept. of Veterans Affairs*, 713 F.3d 874, 880 (6th Cir. 2013) (finding that the plaintiff had not established a prima facie case of retaliation where failure to promote occurred one month after the plaintiff's protected activity, because "only one of the supervisors [who had knowledge of the protected activity] was on the selection committee for the position and the rest of the selection committee did not have any knowledge of her complaint[,]" and "the selection committee considered Warf for the position . . . .").

Assuming that Nicholson has established a prima facie case of retaliation based on the temporal proximity between his March 2009 EEOC charge and the May 2009 denial of promotion, his retaliation claim fails because he cannot demonstrate that Clarksville's proffered legitimate, nondiscriminatory reasons for its denial of promotion were a pretext for retaliation. As discussed above, Clarksville has produced evidence that it did not promote Nicholson to the Maintenance Worker II position because he lacked the requisite welding and plumbing skills, and because he was argumentative and resisted directives from his supervisors. Nicholson has failed to show that these reasons are a mere pretext.

26

Nicholson argues that summary judgment is not appropriate in this matter because Clarksville's true motivations for its actions are difficult to ascertain. *See Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 564 (6th Cir. 2004) (noting "that in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain . . . thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage . . . ."). However, in *Singfield*, the plaintiff produced evidence showing that, but for the defendant's alleged retaliation, it would not have discovered its alleged legitimate, nondiscriminatory reasons for terminating his employment. *Id*. Nicholson has failed to produce similar evidence of but-for causation in the instant matter. His retaliation claim was therefore properly dismissed. *See Nassar*, *supra*.

IV.

For the reasons stated above, we **AFFIRM** the decision of the district court.